# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF GEORGIA
### ALBANY DIVISION

JAN H. GODWIN,             :
:
      Plaintiff,         :
:
v.                      :         CASE NO.: 1:15-CV-140 (LJA)
:
MEMORIAL HOSPITAL AND  :
MANOR,            :
:
      Defendant.      :
_____:

## ORDER

Before the Court is Defendant's Motion for Summary Judgment (the Motion), (Doc. 20). For the reasons set forth below, the Motion is **GRANTED** and Plaintiff's claims against Defendant are **DISMISSED**.

## BACKGROUND

Plaintiff Jan H. Godwin initiated this action against her employer Defendant Memorial Hospital and Manor on August 11, 2015, asserting four causes of action: (1) disability discrimination in violation of the Americans with Disabilities Act (ADA), 42 U.S.C. § 12101, *et seq.*; (2) age discrimination in violation of the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621, *et seq.*; (3) retaliation in violation of the ADA; and (4) retaliation and interference in violation of the Family and Medical Leave Act (FMLA), 29 U.S.C. § 2601, *et seq.* (Doc. 1.)

On March 2, 2017, Defendant filed the Motion, moving for summary judgment on all of Plaintiff's claims. (Doc. 20.) Plaintiff filed her opposition to the Motion on April 6, 2017. (Doc. 25.) Defendant filed its Reply on May 1, 2017. (Doc. 28.) With leave, Plaintiff filed an amended Response on June 13, 2017. (Doc. 31.) Accordingly, the Motion is now ripe for review. *See* M.D. Ga. L.R. 7.3.1(A).

## LEGAL STANDARD

Federal Rule of Civil Procedure 56 allows a party to move for summary judgment when the party contends that no genuine issue of material fact remains and the party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Maddox v. Stephens*, 727 F.3d 1109, 1118 (11th Cir. 2013). "A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor." *Grimes v. Miami Dade Cty.*, 552 F. App'x 902, 904 (11th Cir. 2014).

"An issue of fact is 'material' if it is a legal element of the claim under the applicable substantive law which might affect the outcome of the case." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997). "It is 'genuine' if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party." *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 998 (11th Cir. 1992). On a motion for summary judgment, the Court must view all evidence and factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict in its favor. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Allen*, 121 F.3d at 646.

The movant bears the initial burden of showing, by reference to the record, that there is no genuine issue of material fact. *See Celotex*, 477 U.S. at 323; *Barreto v. Davie Marketplace, LLC*, 331 F. App'x 672, 673 (11th Cir. 2009). The movant can meet this burden by presenting evidence showing that there is no genuine dispute of material fact or by demonstrating that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. *See Celotex*, 477 U.S. at 322-24; *Barreto*, 331 F. App'x at 673. Local Rule 56 further requires that "documents and other record materials relied upon by [the moving party] be clearly identified for the court." M.D. Ga. L.R. 56. "Material facts not supported by specific citation to particular parts of

materials in the record and statements in the form of issues or legal conclusions (rather than material facts) will not be considered by the court." *Id.*

"When that burden has been met, the burden shifts to the nonmovant . . . to go beyond the pleadings and to present competent evidence in the form of affidavits, answers to interrogatories, depositions, admissions and the like, designating specific facts showing a genuine issue for trial." *Lamar v. Wells Fargo Bank*, 597 F. App'x 555, 556-57 (11th Cir. 2014) (internal citations omitted). "All material facts contained in the movant's statement which are not specifically controverted by specific citation to particular parts of materials in the record shall be deemed to have been admitted, unless otherwise inappropriate." M.D. Ga. L.R. 56; *see also Mason v. George*, 24 F. Supp. 3d 1254, 1260 (M.D. Ga. 2014).

As the nonmovant facing a motion for summary judgment, Plaintiff was required to identify those material facts as to which she contends there exists a genuine dispute to be tried. The Local Rules require those responses to controvert statements of material facts in motions for summary judgment with "specific citation to particular parts of materials in the record." *See* M.D. Ga. L.R. 56. Here, Plaintiff's Response to Defendant's Statement of Material Facts fails to comply with the Local Rules. Plaintiff repeatedly responds to Defendant's statements with: "Without knowledge, and therefore, denied." *E.g.*, (Doc. 31-2 ¶¶ 6, 10-13). Accordingly, as to all statements asserted by Defendant in its Motion that are supported by specific record citation, the Court deems them to be admitted where the Plaintiff has failed to properly respond in accordance with the Local Rules.

## FACTUAL BACKGROUND

Defendant Memorial Hospital and Manor is a non-profit hospital located in Bainbridge, Georgia, and is managed by Defendant Hospital Authority of the City of Bainbridge and Decatur County (the Authority). (Doc. 23 ¶¶ 1, 2.)[1] The Authority consists of seven members, five of whom are appointed from Decatur County, Georgia, and two of whom are appointed from the City of Bainbridge, Georgia. (*Id.* ¶ 3.) Authority members are

---

[1] The relevant facts are derived from the parties' statements of material facts and responses thereto, and the record in this case. (Docs. 23 and 31-2.) Where relevant, this factual summary also contains undisputed facts derived from the pleadings, the discovery and disclosure materials on file, and any affidavits, all of which are construed in the light most favorable to Plaintiff as the non-moving party. *See* Fed. R. Civ. P. 56; *Celotex*, 477 U.S. at 323.

appointed for five-year terms. (*Id.* ¶ 4.) The Authority generally meets on a monthly basis. (*Id.* ¶ 5.) The Authority only makes personnel decisions regarding Defendant's CEO. (*Id.* ¶ 6.) It has no authority over other staff. (*Id.*) The CEO has the sole and ultimate authority to hire or fire Defendant's employees. (*Id.* ¶ 13.)

The Hospital is administered by an Executive Staff, which usually consists of a Chief Financial Officer (CFO), a Chief Medical Officer, an Assistant Administrator of Support Services, a Quality Administrator, and an Assistant Administrator of Nursing Services. (*Id.* ¶ 8.) The Executive Staff sometimes includes employees in other roles, such as Chief Culture Officer or Assistant Administrator of Physician Relations/Risk Management. (*Id.* ¶ 9.) Members of the Executive Staff supervise the managers of their respective departments, who are referred to as Department Heads. (Doc. 23 ¶ 10.) Members of the Executive Staff participate in the Authority's monthly meetings and have the authority to make day-to-day decisions regarding the Department Heads who report to them. (*Id.* ¶¶ 11, 12.) Plaintiff has never been a part of the Executive Staff. (*Id.* ¶ 14.)

Defendant is self-insured, such that it pays for its employees' medical claims up to a certain aggregate amount, and, once the claims costs reach that amount, an insurance company covers the excess costs. (*Id.* ¶ 16.) All of Defendant's employees have the same insurance premiums, notwithstanding their age, medical condition, or disability status. (*Id.* ¶ 17.)

Plaintiff began her employment with Defendant as Director of Public Relations and Patient Representative in August of 1996 and remained in that position until 2002. (*Id.* ¶¶ 18. 20.) Plaintiff reported to Defendant's former CEO, Jim Peak, until Peak's termination in November of 2010. (*Id.* ¶¶ 19, 22.) In 2002, Plaintiff's title became Director of Public Relations, Patient Relations, and Volunteer Services. (*Id.* ¶ 21.) Plaintiff worked for Defendant until her termination in 2014. (*Id.* ¶ 127.) From 2011 to 2014, Plaintiff took a total of four leaves of absence under the FMLA. (*Id.* ¶ 54.) Plaintiff received all of the time she requested for each of her four leaves. (*Id.* ¶ 55.)

In 2010, Defendant was experiencing significant financial difficulties. (*Id.* ¶ 23.) Billy Walker and Cynthia Vickers were appointed as Defendant's co-interim administrators. (Doc.

31-2 ¶ 24.) From 2004 to 2010, prior to his promotion to interim administrator, Walker served as Defendant's Chief Financial Officer. (*Id.* ¶ 25.) Plaintiff began reporting to Walker after he was appointed as interim administrator. (*Id.* ¶ 26.) In November of 2010, Walker told Plaintiff that he expected her to work from 8:00 a.m. to 5:00 p.m., and Plaintiff agreed to this schedule. (*Id.* ¶ 28.) Around the same time, Plaintiff was diagnosed with early-stage breast cancer. (*Id.* ¶ 159.) Plaintiff underwent a lumpectomy of the tumor and began undergoing radiation therapy. (*Id.*) Plaintiff took intermittent FLMA leave for her radiation treatments in February and March of 2011. (*Id.* ¶ 163.) Plaintiff continued to work during her radiation treatments, taking leave only to travel to Thomasville, Georgia, for her treatments. (*Id.*) During this time, Plaintiff told Walker when she needed to adjust her schedule due to her health issues. (Doc. 23 ¶ 29; Doc. 23-2 at 66:2–5.) Upon completion of her radiation treatments, Plaintiff was diagnosed with fibromyalgia, which has related symptoms including fatigue, widespread pain, and irritable bowel syndrome. (Doc. 31-2 ¶ 160.)

In March of 2011, Walker became Defendant's permanent CEO, and Karen Faircloth was promoted to CFO. (*Id.* ¶¶ 30, 31.) During this time, Defendant was losing millions of dollars per year as a result of overstaffing and salary-related expenses, increased employee-benefit costs, limitations on health insurance reimbursements, expenses associated with required upgrades to capital equipment, and the overall changes to the economic environment as a result of the recession. (Doc. 23 ¶ 33.) Upon becoming CEO, Walker reviewed Defendant's staff organizational chart and decided to move the position of Director of Public Relations and Volunteer Coordinator, held by Plaintiff, under the supervision of the CFO, Faircloth. (*Id.* ¶ 34.) Faircloth communicated to all employees reporting to her that she expected them to work from 8:00 a.m. to 5:00 p.m. (*Id.* ¶ 38.) Plaintiff told Faircloth that, due to medical issues, she needed to come in later than 8:00 a.m. (Doc. 31-2 ¶ 39.) Faircloth approved Plaintiff's request for a modified schedule. (*Id.* ¶ 40.) Based on Faircloth's approval, Plaintiff usually arrived to work at 9:00 a.m. or later. (*Id.* ¶ 41.) During 2011, Plaintiff was never disciplined for arriving later than 8:00 a.m. (*Id.* ¶ 42.)

One of Plaintiff's responsibilities in her position was to ensure that Defendant's Gift Shop was adequately staffed during operating hours. (*Id.* ¶ 36.) Plaintiff was advised that she was responsible for opening the Gift Shop if a volunteer did not show up. Plaintiff failed to do so and, when admonished, refused to correct the behavior. (*Id.* ¶ 43.) Thus, on October 21, 2011, Faircloth issued a disciplinary action to Plaintiff, charging her with insubordination. (Doc. 22-6.) The action note regarding this incident states:

> Jan has been instructed previously that when the volunteers do not show up to open the Hospital gift shop that she is to open it and run it until a volunteer arrives. On October 21, 2011 . . . I saw that the gift shop had not been opened and it was after 9:30 a.m. I asked Jan why the gift shop was not open and she said that Mr. Smallwood did not show up. I asked her why she did not open it, and she said she was working on the TV ad for next week. I told her she needed (as previously instructed) to open the gift shop. She said, "I'm not." I said to her, "Jan, you are telling me you are not going to do something I am instructing you to do," and she said, "I'm not opening the gift shop." I told her this would be reflected in her personnel file and she said, "fine."

(Doc. 31-3.) Faircloth went on to advise Plaintiff of the hours the gift shop should be open and that she would be terminated if the insubordination continued. (*Id.*) Faircloth further advised Plaintiff that she should resume a regular schedule of 8:00 a.m. to 5:00 p.m. (*Id.*)

On October 27, 2011, Plaintiff filed a grievance with HR Manager Angel Sykes after receiving the disciplinary action from Faircloth. (Doc. 31-2 ¶ 51.) Therein, Plaintiff indicated she felt that Faircloth was creating a hostile work environment and described the gift shop incident from October 21, 2011. (Doc. 23-7 at 1). Plaintiff stated that Faircloth instructed her to open the gift shop, and Plaintiff replied that she "had more pressing responsibilities at that time and that [she] wasn't going to open the gift shop." (*Id.*) A few days after Plaintiff submitted her grievance, she met with Walker and Faircloth. (Doc. 31-2 ¶ 175.) In that meeting, Walker told Plaintiff that she could continue working her modified schedule. (*Id.*) Plaintiff alleges that after she filed her grievance, Faircloth's "harassment and hostility to Plaintiff escalated." (*Id.* ¶ 176.) The only specific example of this alleged harassment is that (despite the fact that Plaintiff was no longer a Patient Representative) Faircloth instructed Plaintiff to visit all in-patients daily and complete daily reports detailing the visits. (*Id.* ¶ 177.)

In December of 2011, Plaintiff took FMLA leave while she underwent gallbladder surgery. (*Id.* ¶ 178.) In or around early 2012, Plaintiff was instructed to start keeping track of her work time by using a time clock. (Doc. 23 ¶ 56.) According to Defendant, the HR Department decided to have Plaintiff clock-in and out to "reduce the administrative burden on HR and Payroll associated with keeping track of Plaintiff's hours and the paperwork she was submitting for various types of leave." (*Id.* ¶ 57.) Plaintiff maintains that she received no training on using the time-clock and had a defective time badge. (Doc. 31-2 ¶ 180.) This, combined with Plaintiff's inability to clock-in while attending numerous off-site events, resulted in frequent emails to other employees, including Faircloth, to correct Plaintiff's time entries. (*Id.*) Plaintiff contends that "Faircloth used Plaintiff's errors in recording time entries to continue and to escalate her harassment and hostility toward Plaintiff." (*Id.* ¶ 181.) Plaintiff gives no specifics regarding how this allegedly escalated harassment manifested. Plaintiff also states that "Faircloth forced Plaintiff to take paid annual leave (PAL) any time that Plaintiff came in later due to illness or doctor's appointments, even during weeks that Plaintiff had over forty hours or over eighty hours for the pay period as a salaried employee and during times that Plaintiff was not on FMLA leave." (*Id.* ¶ 186.)

In May 2012, Plaintiff met with Faircloth and Sykes to confirm her need to clock-in and out and to discuss Plaintiff's modified schedule.[2] (*Id.* ¶ 182.) During the meeting, Faircloth requested documentation supporting Plaintiff's request for a modified schedule, and Plaintiff provided a letter from her physician. (*Id.* ¶ 184.) Plaintiff further requested that she be able to work as late as necessary to complete her tasks. (*Id.* ¶ 185.) Faircloth instructed that Plaintiff should stick to her schedule when possible and advise Faircloth of any instances that would necessitate staying late. (*Id.*) Plaintiff contends that, although Plaintiff was not allowed to work more than forty hours according to Faircloth's directive, Faircloth continued to add to Plaintiff's workload, making it impossible for Plaintiff to complete all tasks within the timeframe allotted by Faircloth. (*Id.* ¶ 187.) According to

---

[2]     Plaintiff makes reference to a modified set schedule being implemented at this meeting. While not explicitly defined, the modified schedule appears to relate to a 9:30 a.m.-6:00 p.m. schedule. (Doc. 31-2 ¶¶ 182, 186.) In notes made by Plaintiff to a memorandum summarizing the meeting, however, Plaintiff explained that she requested the 9:00 a.m.-5:30 p.m. schedule she was given because she taught a college summer course twice a week that began at 6:00 p.m. (Doc. 23-8.)

Plaintiff, "Faircloth only interacted with Plaintiff to reprimand Plaintiff for a perceived fault or error; unless harassing Plaintiff, Faircloth regularly ignored Plaintiff, Plaintiff's emails, and Plaintiff's telephone calls." (*Id.* ¶ 188.)

In August 2012, Plaintiff took a third period of FMLA leave while she underwent surgery on a hernia, which was caused by her previous gallbladder surgery. (*Id.* ¶ 189.) In December 2012, Faircloth re-located Plaintiff's work station from a private office behind the reception desk to "a corner of a filed room in the insurance department." (*Id.* ¶ 190.) Plaintiff asserts that this move negatively impacted her ability to carry out her duties since her position was responsible for both internal and external communication for the hospital and its facilities. (*Id.* ¶ 190.) After her relocation, Plaintiff "reported the harassment and hostility to which she was subjected by Faircloth" to Sykes, and requested counseling through the Employee Assistance Program (EAP) for the "depression and stress that Plaintiff was experiencing because of Faircloth's treatment of her." (*Id.* ¶ 191.) Sykes informed Plaintiff that no EAP counseling was available for her conditions. (*Id.*)

Defendant asserts that in 2012, its financial condition was not improving at the rate it needed to in order to remain sustainable going forward. (Doc. 23 ¶ 68.) Thus, Walker and the Executive Staff began reviewing the hourly/salaried status of Defendant's staff to determine whether there were ways to trim costs without compromising patient care or terminating employees. (*Id.* ¶ 68.) Walker and the Executive Staff determined that there were a few employees who were performing job duties that were more closely aligned with those of hourly, overtime-eligible positions. (*Id.* ¶ 69.) In early 2013, Walker and other members of the Executive Staff made the decision to reclassify Plaintiff's position from Director of Public Relations and Volunteer Coordinator—which was a salaried position—to Marketing and Volunteer Coordinator—an hourly position. (*Id.* ¶ 70.) Walker and the Executive Staff stated that Plaintiff's position was reclassified from "Director" because she did not manage any paid employees. (Doc. 31-2 ¶ 71.) Plaintiff did not, in fact, manage any paid employee; but she did supervise and manage over sixty volunteers for the hospital and hospital Gift Shop. (*Id.* ¶ 194.) Plaintiff's pay did not decrease after she was re-classified, and she retained her employer-paid life insurance and disability insurance. She, however, was no longer

eligible to receive the disability and life insurance packages that were available to managers and directors. (*Id.* ¶¶ 73, 75.) Further, according to Plaintiff, as a result of her title change, Plaintiff was removed from the Bridge to Excellence Senior Leadership Team, removed as sponsor of the Communication/Employee Engagement Leadership Team, restricted from attending Administrative Council meetings, and was left out of the communication loop. (*Id.* ¶ 195.)

In or around early 2013, Walker engaged an outside consultant, who recommended that Defendant create an executive position that would be tasked with supervising Defendant's efforts to improve its overall patient experience. (Doc. 23 ¶ 77.) According to Walker, the patient experience is a high priority for Defendant for several reasons, including that patient satisfaction scores impact the amount of insurance reimbursement Defendant receives—directly affecting Defendant's financial condition. (*Id.* ¶ 78.) Thus, Walker created a new executive position entitled "Chief Culture Officer," to manage Defendant's marketing, patient relations, and culture-related responsibilities, and promoted HR Manager Angel Sykes to the position. (*Id.* ¶¶ 79, 80.) As Chief Culture Officer, Sykes was responsible for improving patient satisfaction and improving the overall patient experience with Defendant. (Doc. 31-2 ¶ 81.) To do this, Sykes took data from patient surveys, compiled the data, and developed recommendations to improve patient satisfaction scores. (*Id.*) Walker hired Ginger Jones to replace Sykes as the HR Manager. (*Id.* ¶ 83.)

Plaintiff was placed under the supervision of Sykes as the Chief Culture Officer. (*Id.* ¶ 84.) Plaintiff's work hours continued to be flexible under Sykes, who allowed Plaintiff to adjust her schedule to attend non-work-related meetings and events. (*Id.* ¶¶ 87, 88.) According to Plaintiff, Sykes began "micromanaging Plaintiff despite Plaintiff's long career in completing her assigned job duties as a public relations professional [and] degree in Public Relations and Communications, and despite Sykes own lack of education or experience in Plaintiff's job duties." (*Id.* ¶ 197.) Sykes "demanded 'new and fresh' ideas, including a new logo, and made references to communications being 'youthful.'" (*Id.* ¶ 198.) In addition, according to Plaintiff, Sykes began assuming duties previously completed by Plaintiff, "despite [Sykes'] lack of education or experience." (*Id.* ¶ 199.)

In December 2013, Plaintiff used a fourth period of FMLA leave for knee surgery. (*Id.* ¶ 202.) Prior to that, in November of 2013, Tammy Hogan, a co-worker, "told Plaintiff that Faircloth was overheard talking about Plaintiff in the hospital's main hallway and said she was going to check to make sure what time Plaintiff clocked in the next day for the health fair, and she was going to get Plaintiff if Plaintiff did not clock in by 6:30 a.m." (*Id.*) Plaintiff wrote an email to Sykes, her supervisor at the time, about Faircloth's "hostile and harassing statement," noting that other employees who worked at the health fair were not required to clock-in. (*Id.*)

By early 2014, Defendant still needed to lower its operating expenses, as its income continued to decline, its accounts payable continued to rise, and its liquidity continued to decrease. (Doc. 23 ¶ 89.) Walker received notice from the Centers for Medicaid and Medicare Services (CMS) that the reimbursements Defendant received for the services it provides were going to be reduced by approximately $575,000.00, pursuant to the Affordable Care Act. (*Id.* ¶ 90.) In the fiscal year ending in March 2014, Plaintiff realized only $31,000.00 in profits despite a $100 million gross revenue. (*Id.* ¶ 91.) In or around early 2014, Walker communicated to his Executive Staff that Defendant needed to reduce operating expenses by about $1 million over the next year. (*Id.* ¶ 92.) Walker concluded that the most effective way to reduce Defendant's expenses and improve its overall financial condition was through implementing a Reduction-In-Force (RIF), as Defendant's labor costs were its single largest expense. (*Id.* ¶¶ 96, 97.)

In early January 2014, as a first step to reducing costs, Walker decided to offer certain eligible employees the option to take a voluntary early retirement package. (*Id.* ¶ 95.) In February 2014, Walker instructed his Executive Staff to ask their Department Heads to identify positions that could be eliminated or restructured, or otherwise make cuts to achieve a savings of approximately $1 million. (*Id.* ¶ 98.) Pursuant to Walker's instruction, Sykes began reviewing the Culture Department, which included only three employees: Sykes as the Chief Culture Officer, Plaintiff as the Marketing and Volunteer Coordinator, and Candy Harvey as the Patient Relations Representative. (*Id.* ¶¶ 85, 99.) Sykes considered the job

duties, total salary, and benefit costs[3] for each position and how essential each position was to Defendant's primary mission of providing quality care to its patients. (*Id.* ¶ 100.) Sykes recommended eliminating the Marketing and Volunteer Coordinator position and redistributing certain responsibilities of that position to other employees. (*Id.* ¶ 101.) According to Sykes, she also decided to recommend that Harvey assume additional duties in the Quality Department, given her relevant experience in discharge planning, case management, and quality work. (*Id.*) Sykes did not consult with Faircloth in developing her recommendations. (*Id.* ¶ 102.)

Shortly thereafter, the Executive Staff met with Walker to discuss their recommendations. (*Id.* ¶ 103.) At the meeting, Sykes presented her recommendations. (*Id.* ¶ 104.) As a member of the Executive Staff, Faircloth attended the meeting but did not express any opinion to Sykes or Walker about Sykes' recommendations. (*Id.* ¶ 108.) Walker and Sykes agreed to move forward in implementing Sykes' recommendations. (*Id.* ¶ 109.) Other Executive Staff members, including Faircloth, presented their recommendations. (*Id.* ¶ 110.) Faircloth recommended the elimination of three positions from her Departments. (*Id.*)

After the meeting, and based on the recommendations from his Executive Staff, Walker put together a final list of the positions that would be eliminated through the RIF. (*Id.* ¶ 111.) Walker made the decision to include Plaintiff's position on the RIF list. (*Id.* ¶ 112.) According to Walker, he did not consider the age or disability status of any of the employees or whether any of the employees had taken a leave of absence. (*Id.* ¶ 113.) Walker never accessed any financial information relating to the actual health insurance claims experience of any employee whose position was being eliminated. (*Id.* ¶ 114.) According to Walker, he created the RIF list based on the recommendations from his Executive Staff, as well as a review of the estimated savings in salary and benefits costs from eliminating each position on the list. (*Id.* ¶ 115.) He calculated that the RIF would result in projected savings of $992,932.00. (*Id.* ¶ 116.) Walker concluded that the positions on the RIF list were not critical to Defendant's primary mission of providing quality care to all of its patients. (*Id.*

---

[3] The review of the benefit costs did not include information about individual employee's health claim costs. (*See* Doc. 23 ¶ 114.)

¶ 117.) In early March, Walker communicated the plan to implement the RIF to the Authority and identified the names of the employees who would be affected. (*Id.* ¶ 120.)

On March 7, 2014, the RIF went into effect, and the sixteen impacted employees were notified by HR Director Jones that their positions had been eliminated. (*Id.* ¶ 124.) In a meeting with Plaintiff, Jones informed Plaintiff that there had been some restructuring at the Hospital and that Plaintiff's position had been eliminated. (*Id.* ¶ 127.) Sykes was present at the meeting but did not speak with Plaintiff. (*Id.* ¶ 128.) Because of Defendant's financial instability, it was unable to offer severance packages to any of the employees whose positions were eliminated. (Doc. 23 ¶ 134.)

Plaintiff was fifty-five years old at the of the termination of her employment. (Doc. 31-1 at 8.) The RIF affected employees of all ages—ranging from their 20s to their 60s. (Doc. 31-2 ¶ 125.) Defendant did not hire anyone else to replace Plaintiff; rather, some of her job duties were re-assigned to other employees. (Doc. 23 ¶ 133.) The marketing duties of the Marketing and Volunteer Coordinator position were reassigned to Sykes, who was thirty-eight years old at the time. (*Id.* ¶ 106.) Responsibility for the volunteers was reassigned to Deborah Brown, who was fifty-two years old at the time. (*Id.* ¶¶ 105, 107.) Oversight of the Gift Shop was reassigned to Carole Clenney, who was sixty years old at the time. (*Id.* ¶ 134.) Defendant's financial difficulties were not resolved after the March 2014 RIF. (*Id.* ¶ 136.) In 2016, Defendant was forced to implement another RIF for cost-savings reasons, which affected about eighteen employees. (*Id.* ¶ 137.) This was Defendant's third RIF in six years. (*Id.*) Plaintiff alleges that Walker received a $35,000.00 raise in 2013 and that Defendant gave approximately $1 million in raises in the year following the 2014 RIF. (Doc. 25-1 ¶ 210; Doc. 25-8 ¶ 14.)

On or about August 30, 2014, Plaintiff completed an EEOC Intake Questionnaire. (Doc. 23 ¶ 138.) At or around the same time, she submitted a letter to the EEOC. (*Id.* ¶ 139.) Plaintiff signed an EEOC Charge of Discrimination on September 25, 2014, and the EEOC conducted an investigation. (*Id.* ¶¶ 142, 143.) At the conclusion of the investigation, the EEOC issued Plaintiff a Dismissal and Notice of Rights. (*Id.* ¶ 144.)

<h1 style="text-align:center">DISCUSSION</h1>

## I.    Exhaustion

"In order to litigate a claim for discrimination under . . . the ADA[ ] or the ADEA, a plaintiff must first exhaust [her] administrative remedies, beginning with the filling of a charge of discrimination with the EEOC." *Rizo v. Alabama Dep't of Human Res.*, 228 F. App'x 832, 835 (11th Cir. 2007). "In Georgia, exhaustion requires that a plaintiff file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Hubbard v. Ga. Farm Bureau Mut. Ins. Co.*, 2013 WL 1333804, at * 7 (M.D. Ga. Mar. 29, 2013). Defendant argues that Plaintiff failed to exhaust her administrative remedies as to her ADA and ADEA claims.

Plaintiff filed an Intake Questionnaire with the EEOC on August 30, 2014, and a formal Charge on September 25, 2014. (Doc. 25-15.) Defendant argues that because Plaintiff's Charge was not filed within 180 days of her termination on March 7, 2014—in this case, the last instance of allegedly unlawful discrimination—her allegations are time-barred. Alternatively, Defendant asserts that even if Plaintiff's Intake Questionnaire suffices to toll the 180-day time limitation, Plaintiff's ADA and ADEA claims should be limited to those involving her termination, which Defendant argues is the only alleged incident of unlawful discrimination that took place within the 180-day period prior to Plaintiff's filing of the Intake Questionnaire, which began on March 3, 2014.

As a general rule, "an intake questionnaire does not constitute a valid charge . . . for purposes of the statute of limitations." *Sanford v. Walmart*, 2016 WL 5662029, *2 (M.D. Ga. Sept. 29, 2016). However, a court may find that a verified intake questionnaire, which includes the basic information suggested by 29 C.F.R. § 1601.12(a), may constitute a charge for purposes of the statute of limitations "when the circumstances of the case would convince a reasonable person that the charging party manifested her intent to activate the administrative process by filing the intake questionnaire with the EEOC." *Hubbard*, 2013 WL 1333804, at *7 (citations and quotations omitted). In determining whether the intake questionnaire can function as a charge:

> [T]he Eleventh Circuit requires analysis of the 'following question: Would the circumstances of this case convince a reasonable person that [plaintiff]

13

manifested her intent to activate the machinery of [the ADA and ADEA] by lodging her intake questionnaire with the EEOC?' 'Some facts relevant to [that] inquiry include what [plaintiff] and EEOC personnel said to each other, what the questionnaire form itself indicated, and how the EEOC responded to the completed questionnaire.' Also the Supreme Court has explained that whether the filing demonstrates 'an individual's intent to have the agency initiate its investigatory and conciliation processes . . . must be examined from the standpoint of an objective observer to determine whether, by a reasonable construction of its terms, the filer requests the agency to activate its machinery and remedial processes.'

*Id.* (quoting *Wilkerson v. Grinnell Corp.*, 951 F.2d 1314, 1321 (11th Cir. 2001); *Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 402 (2008)).

The EEOC regulations require that:

Each charge should contain . . . [t]he full name, address and telephone number of the person making the charge . . .[t]he full name and address of the person against whom the charge is made, . . . [a] clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices . . . [i]f known, the approximate number of employees of the respondent employer . . . and . . . [a] statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a State or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency.

29 C.F.R. § 1601.12(a). Plaintiff's intake questionnaire meets the basic requirements for an EEOC charge. While Plaintiff did not verify her questionnaire, she subsequently verified the official charge she filed on September 25, 2014. (Doc. 23-11 at 3.) The EEOC regulations provide for curing the omission of "failure to verify the charge" and that such an amendment relates back. *Hubbard*, 2013 WL 1333804, at *8 (quoting 29 C.F.R. § 1601.12(b)).

While it is unclear when the EEOC initiated its investigation, to an objective observer, it would appear that Plaintiff intended the EEOC to activate its machinery and the remedial process with the filling of the Questionnaire. The Questionnaire stated, "If you want to file a charge, you should check Box 2." (Doc. 25-15 at 6.) Plaintiff checked Box 2, which indicated:

I want to file a charge of discrimination, and I authorize the EEOC to look into the discrimination I described above. I understand that the EEOC must

give the employer, union, or employment agency that I accuse of discrimination information about the charge, including my name. I also understand that the EEOC can only accept charges of job discrimination based on race, color, religion, sex, national origin, disability, age, genetic information, or retaliation for opposing discrimination.

(*Id.*) Moreover, as to what the form itself indicated, Item 3 in the Privacy Act Statement on the Questionnaire states: "Consistent with 29 [C.F.R. §] 1601.12(b) and 29 [C.F.R. §] 1626.8(c), this questionnaire may serve as a charge if it meets the elements of a charge." Thus, to the extent that the claims alleged in Plaintiff's Questionnaire are timely, as discussed below, the Court will consider their merits.

Notwithstanding, Defendant argues that many of Plaintiff's allegations are time-barred. "In Georgia, exhaustion requires that a plaintiff file a charge of discrimination with the EEOC within 180 days after the alleged unlawful employment practice occurred." *Hubbard*, 2013 WL 1333804, at *7. "Therefore, any acts of alleged discrimination that occurred prior to 180-days before the filing of [an] EEOC charge are untimely filed and no longer actionable." *Sanford*, 2016 WL 5662029, at *2. The 180-day period prior to Plaintiff's filing of her Questionnaire on August 30, 2014 commenced on March 3, 2014. Thus, any allegations stemming from events prior to March 3, 2014 are untimely. *See id.*

Construing Plaintiff's Questionnaire broadly, Plaintiff alleges the following instances of discrimination: (1) being "continuously harassed" by Faircloth in 2012 and 2013 after requesting a flexible work schedule; (2) being harassed by Sykes in 2013 and 2014; (3) being treated differently than other employees by being required to clock in and out in 2012 despite being salaried; (4) being "demoted" on January 4, 2013, from salaried to hourly status after complaining about Faircloth; and (5) being terminated on March 7, 2014.

Defendant argues that "[e]ven if Plaintiff is given the benefit of the doubt and her unsworn letter and/or EEOC questionnaire are treated as a 'Charge,' it is beyond dispute that Plaintiff is still barred from pursuing any ADA/ADEA claims based on conduct that occurred prior to March 3, 2014." (Doc. 28 at 3.) Plaintiff responds, arguing that all allegations should be considered because "Plaintiff indicated [on her charge] that the treatment was on-going from 2011 until her termination." (Doc. 31-1 at 6.)

Regardless of what Plaintiff indicated on her Charge, the purported demotion and termination are discrete acts of alleged discrimination. *Jordan v. City of Montgomery*, 283 F. App'x 766, 767 (11th Cir. 2008); *Crayton v. Ala. Dep't of Agric. & Indus.*, 589 F. Supp. 2d 1268, 1278 n.7 (M.D. Ala. 2008). "Each discrete discriminatory act starts a new clock for filing charges alleging that act. The charge, therefore, must be filed within the [180-day] time period after the discrete discriminatory act occurred." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002). Here, the clock for filing charges based on Plaintiff's purported demotion began to run on January 3, 2013, and Plaintiff was required to file her charge by July 2013—well before Plaintiff filed her Questionnaire in August of 2014. *See id.* Thus, the ADA and ADEA claims stemming from Plaintiff's allegations of demotion are time-barred.

Plaintiff's hostile work environment claims are also barred. While the Supreme Court has explained that the very nature of hostile work environment claims involve repeated conduct, *id.* at 115, in order for hostile work environment claims to be timely, at least one act must have occurred within the limitations period. *Smithers v. Wynne*, 2007 WL 951748, at *4 (M.D. Ga. Mar. 28, 2007), *aff'd*, 319 F. App'x 755 (11th Cir. 2008). The majority of the harassment alleged in Plaintiff's questionnaire occurred in 2011, 2012, and early 2013, while Plaintiff was under Faircloth's supervision. Though it is unclear whether Plaintiff intended to allege a hostile work environment claim stemming from her supervision by Sykes,[4] even construing Plaintiff's allegations liberally, the most recent instance of purported harassment by Sykes occurred in January 2014—prior to the March 3, 2014 limitation.[5] Accordingly, the hostile work environment claims are time-barred.[6]

---

[4] In a complaint letter filed contemporaneously with her Questionnaire, Plaintiff briefly states that after she was transferred from Faircloth's to Sykes' supervision, "the harassment continued in a more subtle way." (Doc. 25-15 at 11.) Plaintiff indicates that the alleged harassment was documented in emails; however, the only emails attached to Plaintiff's Response in which Sykes was a recipient or sender were pertaining to Plaintiff's complaints about Faircloth from the period in which Sykes was HR Director and Plaintiff was under Faircloth's supervision. (*See* Docs. 25-10, 25-12.) Moreover, while in her official Charge, Plaintiff clearly alleges that Faircloth subjected her to a hostile work environment, she does not mention any harassment by Sykes.

[5] The only specific allegation involving Sykes was made in an amendment letter Plaintiff sent to the EEOC with her official Charge. (Doc. 25-15 at 13.) Therein, Plaintiff indicated that she was "subjected to unreasonable requests in retaliation for her request for reasonable accommodation," when, in January 2014, Sykes asked Plaintiff to remove a twelve-foot Christmas tree from the hospital lobby and Plaintiff had to remind Sykes that documents in her personnel file restricted Plaintiff's lifting to no more than five pounds. (*Id.*) Plaintiff does not indicate the outcome of this interaction—whether Sykes continued to insist Plaintiff

Thus, Plaintiff has failed to exhaust her remedies by failing to timely file her claims for all but her allegations stemming from the termination. The Court, however, will exercise its discretion to consider Plaintiff's untimely allegations as providing background or context for Plaintiff's claims. *E.E.O.C. v. Atlanta Gastroenterology Associates, LLC*, 2007 WL 602212, at *14 (N.D. Ga. Feb. 16, 2007) (citing to *Allen v. Montgomery Cnty. Ala.*, 788 F.2d 1485, 1488 (11th Cir. 1986)) ("[T]ime-barred evidence of discriminatory treatment may be used . . . to illuminate current practices which, viewed in isolation, may not indicate discriminatory motives"); *see also United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977) (noting that a discriminatory act "may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue . . . .").

## II.    Disability discrimination against Plaintiff

Plaintiff alleges that, in violation of the ADA, she was wrongfully terminated on the basis of her disability and that she was retaliated against for requesting an accommodation and complaining about discriminatory treatment. (Doc. 31-1 at 7, 11.)

### A.  Wrongful termination

"Under the ADA, an employer cannot discriminate 'against a qualified individual with a disability based on that disability when the discrimination involves the hiring, advancement, termination, or conditions of employment of that qualified individual.'" *Peoples v. Muscogee Cty. Sch. Dist.*, 2013 WL 24883977, at *1 (M.D. Ga. June 10, 2013) (quoting *Standard v. A.B.E.L. Servs., Inc.*, 161 F.3d 1318, 1327 (11th Cir. 1998)). The *McDonnell Douglas*

---

move the tree or accommodated Plaintiff after being advised of the situation. Absent an allegation that she was still required to move the tree—which likely still would not rise to the level of actionable discrimination by Sykes—this allegation does not constitute harassment by Sykes.

[6]      Where a discrete act is sufficiently related to a hostile work environment claim so that it may be fairly considered part of the same claim, it can form the basis for consideration of untimely non-discrete acts that are part of the same claim. *Chambless v. Louisiana-Pac. Corp.*, 481 F.3d 1345, 1350 (11th Cir. 2007). Here, the timely alleged discrete act of Plaintiff's termination does not meet that test in a way that would allow the consideration of Plaintiff's untimely hostile work environment claims. The circumstances surrounding Plaintiff's termination—namely that: (1) Plaintiff was one of sixteen employees terminated; (2) Walker, not Sykes or Faircloth, made the final decision to terminate Plaintiff's position; and (3) the termination occurred at least three months after the last instance of harassment alleged by Plaintiff—do not constitute discrete acts that were the same type of harassment characterized in Plaintiff's claims against Faircloth and Sykes such that the untimely acts may be considered. *See id.* ("The circumstances surrounding [defendant's] failure to promote and retaliation against [plaintiff] do not suggest that those discrete acts were the same type of discriminatory intimidation, ridicule, and insult that characterized the untimely allegations.")

framework is applicable when analyzing ADA claims. *Id.* "To avoid summary judgment, Plaintiff must first point to sufficient evidence to support a *prima facie* case of employment discrimination." *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). Once a plaintiff establishes a *prima facie* case, a presumption of discrimination is created, and the defendant has the burden of articulating a legitimate, non-discriminatory reason for the plaintiff's termination. *Id.* "Plaintiff can then avoid summary judgment if [s]he produces sufficient evidence from which a reasonable jury can conclude that [defendant's] articulated non-discriminatory reason is pretext for discrimination." *Id.*

In order to establish a *prima facie* case under the ADA, a plaintiff must show that (1) she has a disability; (2) she is a qualified individual; and (3) she was subjected to unlawful discrimination as a result of her disability. *Bivins v. Bruno's, Inc.*, 953 F. Supp. 1558, 1561 (M.D. Ga. 1997), *aff'd*, 247 F.3d 245 (11th Cir. 2001). Here, Defendant does not contest that Plaintiff had a disability or was a qualified individual; rather, Defendant argues that Plaintiff has failed to point to evidence that she was terminated on the basis of her disability. (Doc. 21 at 10.) Plaintiff can show that she was discriminated against because of her disability by showing that similarly situated employees without her disabilities were treated more favorably than she. *See Robinson v. St. Mary's Health Care Sys., Inc.*, 2007 WL 710155, at *6 (M.D. Ga. Mar. 6, 2007). Alternatively, Plaintiff can meet the third prong of her *prima facie* case by showing "other evidence of discrimination." *See id.* at *7. In her Response, Plaintiff elects not to allege any comparator. (*See* Doc. 31-1 at 6-8.) Rather, Plaintiff attempts to demonstrate "other evidence of discrimination," stating the following:

> Plaintiff makes the final prong of her [*prima facie*] case by showing that she was unlawfully discriminated against on the basis of her actual or perceived disability. Specifically, Defendant ignored Plaintiff's requests for accommodation, several times, allowing supervisors to remove the flexible schedule, demoted Plaintiff when she requested EAP counseling, allowed supervisors to harass Plaintiff and treat her with hostility for using the accommodation, forced Plaintiff to use PAL time when she did use the accommodation, rather than allowing her to make up time like other employees did, and then terminated Plaintiff after her multiple requests for an accommodation.

(*Id.* at 7.) Plaintiff's conclusory statements—devoid of citation to the record—do not constitute evidence sufficient to state a *prima facie* case of discrimination. However, even had Plaintiff been successful in making a *prima facie* case, Plaintiff's claim of wrongful termination in violation of the ADA could not survive summary judgment because, as discussed below, Plaintiff has failed to provide evidence that Defendant's articulated non-discriminatory reason for Plaintiff's termination is pretext for discrimination.

## B. Retaliation

Plaintiff fails specifically to respond to Defendant's arguments for summary judgment on Plaintiff's ADEA retaliation claim; therefore, the Court deems Plaintiff's ADEA retaliation claim abandoned. *See Holmes v. Georgia*, 2012 WL 12895060, at *10 (M.D. Ga. Mar. 30, 2012). With regard to her ADA retaliation claim, Plaintiff alleges that she was terminated in retaliation for complaining about discriminatory treatment and for requesting an accommodation. (Doc. 31-1 at 11.) To state a claim for retaliation, an employee must show that: (1) she engaged in statutorily protected activity; (2) she suffered an adverse employment decision; and (3) the decision was causally related to the protected activity. *Corbin v. Med. Ctr., Navicent Health*, 2016 WL 5724992, at *10 (M.D. Ga. Sept. 29, 2016) (citations omitted). Once the employee makes this showing, the burden then shifts to the defendant to articulate a legitimate reason for the adverse action. *Id.* "If the defendant does so, the plaintiff must then show that the defendant's proffered reason for the adverse action is pretextual." *Id.*

Plaintiff argues that she participated in statutorily protected activity when she: (1) filed a grievance against Faircloth with Sykes in October of 2011; (2) requested counseling through Defendant's employee assistance program "because of the stress she underwent from Faircloth's hostile and abusive treatment of her because she required the accommodation"; and (3) complained to Walker, to HR, and to members of the Authority "both verbally and in writing that she was being treated differently, that she was being harassed and abused, because of her need for an accommodation caused by her myriad of medical conditions." (Doc. 31-1 at 11.) Defendant argues that even if the instances alleged by Plaintiff constitute protected activity, Plaintiff cannot show a causal connection between the alleged protected activity and her termination. (Doc. 28 at 8.)

Plaintiff filed her grievance against Faircloth in October 2011 and requested counseling in December of 2012. Both instances occurred over a year prior to Plaintiff's termination in March of 2014. Though Plaintiff alleges that she complained to Walker, HR, and the Authority, Plaintiff has failed to identify or produce any evidence of the complaints. (Doc. 31-2 ¶ 207.) Plaintiff has provided no direct evidence that the termination was causally connected to the alleged protected activity. Courts have found a causal connection sufficient to establish a *prima facie* case where the protected activity and the adverse employment action occurred closely in time. Six months, however, has been deemed too long to establish the necessary temporal connection. *Webb-Edwards v. Orange Cty. Sherriff's Office*, 525 F.3d 1013, 1029 (11th Cir. 2008) (finding six-month gap too long to support causation element in retaliation case). Since Plaintiff has failed to allege that she participated in a protected activity within a time frame that would allow the Court to infer a causal connection, she has failed to state a *prima facie* case of retaliation under the ADA. However, even had Plaintiff been successful in making a *prima facie* case, Plaintiff's claim of retaliation in violation of the ADA could not survive summary judgment because, as discussed below, Plaintiff has failed to provide evidence that Defendant's articulated non-discriminatory reason for Plaintiff's termination is pretext for discrimination.[7]

### III.    Age discrimination against Plaintiff

Plaintiff alleges that she was terminated because of her age in violation of the ADEA. (Doc. 31-1 at 8.) Where, as here, a Plaintiff proffers circumstantial evidence to establish an ADEA claim, the Court applies the burden-shifting framework established in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973). *Mazzeo v. Color Resolutions Intern.*, LLC, 746 F.3d 1264, 1270 (11th Cir. 2014). In cases involving an RIF, a plaintiff may establish a *prima facie* case of unlawful discrimination by showing: (1) that she was in a protected age group and was adversely affected by an employment decision; (2) that she was qualified for the position

---

[7]     Plaintiff argues that any gap between Plaintiff's protected activities and the adverse action could be viewed as Defendant's "first opportunity" to exact its revenge. (Doc. 31-1 at 14 (citing *Price v. Thompson*, 380 F.3d 209, 213 (4th Cir. 2004) (holding that plaintiff established a *prima facie* case because a jury could reasonably conclude that, despite time lapse, defendant's failure to hire was defendant's "first opportunity" to retaliate).) Plaintiff fails, however, to provide any evidence indicating that the March 2014 RIF was Plaintiff's first opportunity to terminate Plaintiff.

held at the time of discharge; and (3) evidence by which a fact finder could reasonably conclude that the employer intended to discriminate on the basis of age in reaching that decision.[8] *Zaben v. Air Prods. & Chems., Inc.*, 129 F.3d 1453, 1457 (11th Cir. 1997). Once a plaintiff establishes a *prima facie* case of discrimination, the employer may rebut the resulting presumption of discrimination by articulating at least one legitimate, nondiscriminatory reason for an employment decision. *Chapman v. Al Transport*, 229 F.3d 1012, 1024 (11th Cir. 2000). After the employer articulates such a reason, the burden shifts back to plaintiff to produce evidence that the employer's proffered reason in pretext for discrimination. *Id.* at 1024–25.

The parties do not dispute that Plaintiff is in the protected age group, that she was adversely affected by an employment decision, or that she was qualified for the position held at the time of discharge. Rather, Defendant contends that Plaintiff has not presented evidence by which a fact finder could reasonably conclude that the employer intended to discriminate against her on the basis of age in reaching the decision to terminate her. The Court agrees. Plaintiff attempts to establish that she was discriminated against because of her age by making the general statements that she was harassed by younger supervisors and that "younger, less experienced, and less educated employees received promotions and pay raises, and retained their jobs in the face of an RIF." (Doc. 31-1 at 8.) Plaintiff, however, does not provide a specific indication as to whom she is referring, nor does she provide citations to the record to support her assertion regarding promotions and pay raises. Her general and unsubstantiated allegations are not sufficient to support a finding that Plaintiff has

---

[8]    In her Response, Plaintiff advances the application of the standard elements of a *prima facie* case under the ADEA. If the Court determined that, rather than Plaintiff's position having been eliminated, Plaintiff had effectively been replaced through the redistribution of her job duties, the standard *prima facie* elements would be appropriate. Here, the facts do not support such a determination. *See Mazzeo*, 746 F.3d at 1271; *Minton v. Am. Bankers Inc.*, 2003 WL 21303330, at *1 (11th Cir. Feb. 6, 2003); *Rollins v. TechSouth, Inc.*, 833 F.2d 1525, 1529 (11th Cir. 1987). Plaintiff's claim fails under either standard. The elements of a standard ADEA *prima facie* case are that the plaintiff was a member of the protected group, that the plaintiff was subject to an adverse employment action, that a substantially younger person filled the position from which she was fired, and that the plaintiff was qualified for the job in question. *Kragor v. Takeda Pharm. Am., Inc.*, 702 F.3d 1304, 1308 (11th Cir. 2012). Even assuming that Plaintiff established a *prima facie* case under the standard test by showing that Sykes, who was thirty-eight at the time and substantially younger than Plaintiff, replaced Plaintiff by assuming her marketing responsibilities, as discussed below, Plaintiff is still unable to show that Defendant's articulated reason for her termination—the RIF—was pretext for unlawful discrimination.

established a *prima facie* case of discrimination. The fact that the sixteen employees terminated during the 2014 RIF ranged in age from their 20s to 60s also undermines a finding of intent necessary to establish the *prima facie* case. Finally, Sykes' purported statements encouraging "young and fresh ideas" also is not proof of intent, as the Seventh Circuit has explained—and this Court agrees—that "common experience suggests that one's age has no necessary correlation to whether or not one's ideas are 'young' or 'fresh.'" *Larimer v. Dayton Hudson Corp.*, 137 F.3d 497, 500 (7th Cir. 1998).

## IV. FMLA Claims

Plaintiff claims that Defendant interfered with her FMLA rights by requiring that she use PAL time instead of being able to make up her missed hours. (Doc. 31-1 at 16.) Moreover, Plaintiff argues that she was retaliated against for taking and requesting FMLA leave. (*Id.* at 17.) The Court notes that FMLA claims are not subject to the exhaustion requirements of the ADA and ADEA, and, as Defendant admits, Plaintiff's FMLA claims are timely. (Doc. 21 at 2.)

### A. Interference

"The [FMLA] confers [upon an employee] the right to take twelve weeks of job leave . . . and the right to be reinstated to her original job (or an equivalent) after FMLA leave." *White v. Beltram Edge Tool Supply, Inc.*, 789 F.3d 1188, 1191 (11th Cir. 2015) (citation and punctuation omitted). "To protect these rights, the FMLA creates a private right of action. If an employer interferes with an employee's FMLA rights, she may sue for equitable relief or money damages." *Id.* "An [FMLA] interference claim has two elements: (1) the employee was entitled to a benefit under the FMLA, and (2) her employer denied her that benefit." *Id.* An employer may require an employee's paid or sick leave to run concurrently with the employee's exercise of FMLA leave. *Dixon v. Pub. Health Tr. Of Dade Cty.*, 567 F. App'x 822, 826 (11th Cir. 2014). "The reasonable-accommodation requirement under the ADA is distinct from a FMLA interference claim." *Gilliard v. Georgia Dep't of Corr.*, 500 F. App'x 860, 865 (11th Cir. 2012).

Here, Plaintiff has presented no evidence that she was denied an FMLA benefit. Plaintiff requested and was allowed to take FMLA leave four times between 2011 and 2014.

As to Plaintiff's claim that Defendant required her to use PAL time as opposed to making up her hours, the FMLA does not require an employer to allow an employee taking such leave to make the hours up. In fact, the Act specifically allows an employer to require an employee's paid or sick leave to run concurrently with the employee's exercise of FMLA leave. *Dixon*, 567 F. App'x at 826. Accordingly, there is no genuine issue of material fact as to the FMLA interference claim.

### B. Retaliation

"To prove a retaliation claim under the FMLA, the plaintiff must show that her employer intentionally discriminated against her for having exercised an FMLA right. In other words, the plaintiff must show that her employer's actions were motivated by an impermissible retaliatory or discriminatory animus." *Caldwell v. Clayton Cty. Sch. Dist.*, 604 F. App'x 855, 860 (11th Cir. 2015) (citation and punctuation omitted). Where, as here, the plaintiff presents no direct evidence of retaliatory intent, courts analyze the circumstantial evidence presented under the burden-shifting framework of *McDonnell Douglas*. *Caldwell*, 604 F. App'x at 860. To make a *prima facie* showing of FMLA retaliation, Plaintiff must show that "(1) she engaged in activity protected by the FMLA, (2) she suffered an adverse employment decision, and (3) the adverse decision was causally related to the protected activity." *Id.* "Close temporal proximity between protected conduct and an adverse employment action is generally sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection." *Hurlbert v. St. Mary's Health Care Sys., Inc.*, 439 F.3d 1286, 1298 (11th Cir. 2006) (citation and punctuation omitted). The Eleventh Circuit recently held that "temporal proximity, for the purpose of establishing the causation prong of a *prima facie* case of FMLA retaliation, should be measured from the last day of an employee's FMLA leave until the adverse employment action at issue occurs." *Jones v. Gulf Coast Health Care of Delaware, LLC*, 854 F.3d 1261, 1272 (11th Cir. 2017); *see also Evans v. Books-A-Million*, 762 F.3d 1288, 1297 n.6 (11th Cir. 2014) (noting that fact issue could exist where employee reassigned immediately after returning from FMLA leave). "The burden shifts back to [Defendant] if [Plaintiff] can establish a *prima facie* case, requiring [Defendant] to articulate a legitimate, nondiscriminatory reason for [Plaintiff's] termination. [I]f [Defendant] meets this burden,

then [Plaintiff] must show that the supposedly legitimate reason was in fact a pretext designed to mask illegal discrimination." *Jones*, 854 F.3d at 1271.

Plaintiff has failed to allege a *prima facie* case for FMLA retaliation. Plaintiff argues that because she "engaged in protected activity in requesting and taking FMLA leave and requiring additional FMLA leave, she suffered adverse action when she was harassed, verbally abused, demoted and ultimately terminated . . . ." (Doc. 31-1 at 17.) The only adverse action timely alleged by Plaintiff was her termination on March 7, 2014. *See supra*; (Doc. 31-2 ¶ 124). The record reflects that Plaintiff took her final FMLA leave in December of 2013, between three and four months before she was terminated. (*Id.* ¶ 202.) Three months, in the absence of evidence of causation, is insufficient to support causation. *Drago v. Jenne*, 453 F.3d 1301, 1308 (11th Cir. 2006) ("We are not persuaded that three months . . . is sufficiently proximate to show causation."). Moreover, even had Plaintiff been successful in making a *prima facie* case, Plaintiff's claim of FMLA retaliation could not survive summary judgment because, as discussed below, Plaintiff has failed to provide evidence that Defendant's articulated non-discriminatory reason for Plaintiff's termination is pretext for discrimination.

## V. Plaintiff fails to show pretext

Defendant has articulated a non-discriminatory reason for Plaintiff's termination. *Jordan*, 504 F. App'x at 870. Defendant proffers that it was experiencing financial difficulty and needed to capture a savings of $1 million; therefore, Defendant instituted an RIF, eliminating sixteen positions. (Doc. 31-2 ¶ 124.) The terminated employees ranged in age from their 20s through their 60s. (*Id.* ¶ 125.) According to Defendant, Plaintiff's position was chosen for termination because it was not critical to Defendant's primary mission of providing quality care to its customers. (*Id.* ¶ 117.) Plaintiff was not replaced; rather, certain responsibilities of her position were distributed to other employees. (*Id.* ¶ 101.)

Plaintiff has failed to show evidence sufficient to establish that Defendant's articulated non-discriminatory reason for Plaintiff's termination is pretext for unlawful discrimination under the ADA, ADEA, or FMLA. To demonstrate pretext, Plaintiff must show both that the employer's proffered reason is false, and that discrimination was the real

reason for her termination. *Jordan*, 504 F. App'x at 870. She may do this either directly by establishing that a discriminatory reason more likely than not motivated the employer, or indirectly by showing that the proffered reason is unworthy of credence. *Id.* "Under the latter approach, [Plaintiff] must demonstrate such weaknesses, implausibilities, inconsistencies, or contradictions in the proffered reason that a reasonable factfinder could conclude that it is unworthy of credit." *Id.* The Court "is not in the business of adjudging whether employment decisions are prudent or fair, and are solely concerned with whether unlawful discriminatory animus motivated a challenged employment decision." *Id.* (quotations and citation omitted).

Plaintiff argues that Defendant's proffered nondiscriminatory reasons for her termination are inconsistent. As support, Plaintiff simply re-alleges the adverse actions she alleged in asserting her *prima facie* cases—namely that she was harassed, her flexible schedule was removed, and she was demoted and ultimately terminated. While the evidence of pretext may include the same evidence offered initially to establish the *prima facie* case, the evidence must meet the articulated reason head on and rebut it. *Wilson v. B/E Aerospace*, 376 F.3d 1079, 1088 (11th Cir. 2004). Plaintiff does not rebut Defendant's explanation that it implemented an RIF because it was experiencing financial difficulties.

Plaintiff's only other evidence of pretext is her allegation that Walker purportedly received a $35,000.00 raise in 2013 and that Defendant gave approximately $1 million in raises in the year following the 2014 RIF. However, even if true, these claims are not enough to show pretext. In a similar instance, the Eleventh Circuit held:

> The fact that [defendant] chose to give bonuses and raises to various executives and supervisors at the Jesup mill does not mean the $50 million loss in sales suffered at the Jesup mill did not induce [defendant] to explore cost-cutting measures at that mill which ultimately resulted in the RIF there. [Plaintiff's] real beef seems to be that [Defendant] chose to cut jobs to reduce costs instead of cutting out bonuses and raises. However, the employer is free to choose whatever means it wants, so long as it is not discriminatory, in responding to bad economic conditions. It is not our role to second-guess [defendant's] decision to respond to a loss in sales at the mill by cutting its workforce.

*Beaver v. Rayonier, Inc.*, 200 F. 3d 723, 728 (11th Cir. 1999). Here, the Court will not second-guess Defendant's decision to respond to its losses by cutting its workforce. The RIF terminated the positions of not only Plaintiff, but fifteen other employees. In responding to financial loss, Defendant "is free to choose whatever means it wants, so long as it is not discriminatory," and Plaintiff has failed to show her termination in the RIF was discriminatory. *See id.* Accordingly, summary judgment for Defendant as to Plaintiff's ADA, ADEA, and FMLA claims is **GRANTED**.

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment (Doc. 20) is **GRANTED**. Plaintiff's claims against Defendant are **DISMISSED**.


**SO ORDERED**, this 28th day of March, 2018.


_____/s/ Leslie J. Abrams_____
**LESLIE J. ABRAMS, JUDGE**
**UNITED STATES DISTRICT COURT**